**INTERSTATE DISTRIBUTING COMPANY, a corporation, Plaintiff,**

v.

**UNITED STATES of America and Interstate Commerce Commission, Defendants,**

and

**Los Angeles-Seattle Motor Express, Inc., et al., Intervening Defendants.**

**Civ. A. No. 2941.**

United States District Court
W. D. Washington, S. D.

Aug. 8, 1967.

George R. LaBissoniere, Lane, Powell, Moss & Miller and Wilbur J. Lawrence, Seattle, Wash., for plaintiff.

Donald F. Turner, Asst. Atty. Gen., John H. D. Wigger, Attorney, Dept. of Justice, Washington, D. C., Eugene G. Cushing, U. S. Atty., Seattle, Wash., for United States.

Robert W. Ginnane, General Counsel, Nahum Litt, Attorney, Washington, D. C., for Interstate Commerce Com.

James F. Henriot and Eisenhower & Carlson, Tacoma, Wash., and John G. McLaughlin and Adams, McLaughlin & Simpson, Portland, Or., for intervening defendants.

Before POPE, Circuit Judge, and BOLDT and BEEKS, District Judges.

POPE, Circuit Judge.

In this matter the Commission denied the application of Interstate Distributing Company for a permit authorizing the operation as a contract carrier by motor vehicle over irregular routes for the account of West Coast Grocery Company of Tacoma. West Coast is one of the three largest grocery distributors in the Northwest dealing in all kinds of merchandise such as is ordinarily dealt in by wholesale and retail grocery establishments. Heretofore the precise service sought to be performed by the applicant was secured by West Coast through use of leased motor vehicles and trucks between points in California, on the one hand, and Tacoma, Aberdeen and Chehalis, Washington, on the other. West Coast main headquarters was at Tacoma but it had branches at Chehalis and Aberdeen to which deliveries of grocery products were required. In brief, the proposal presented was that Interstate Distributing procure a permit authorizing it to operate as a contract carrier exclusively for West Coast Grocery providing the same transportation which West Coast had previously conducted for itself through the vehicles which it had leased from Interstate Distributing.

The transportation for which permit was sought was by no means a large portion of the transportation requirements of West Coast. West Coast used, and proposed to continue to use, rail, piggy back rail, common carrier truck transportation, and some ocean transportation to procure its needs of grocery products from California and deliver them to its Tacoma, Aberdeen and Chehalis warehouses. The testimony showed that between 15% and 20% of such transportation needs was through common carrier trucks; some 40% was by rail and piggy back rail, while the private equipment mentioned was used normally to transfer approximately eight truck loads a week out of California to the warehouses mentioned.

The applicant for the permit, and the shipper in aid of the applicant, made an attempt to show that the shipper had a specialized or particular need for the service which Interstate Distributing Company proposed to supply under its permit, a need which had prompted the establishment of the private carriage above described, and which was supposed to be supplanted through the procuring of the permit sought here.

The Commission found against those claims saying that the applicant's "proposal does not appear to involve anything which might be termed 'specialized' or 'personalized' service tailored to a shipper's distinct needs."

■ An examination of the record discloses that that finding is unsupported by substantial evidence. There is clear and uncontradicted evidence that although the bulk of West Coast's requirements of California products may be supplied by rail or other common carrier, yet it had the unique and special requirement for the sort of service which it had usually been obtaining through the use of its leased equipment. The manner in which this sort of service was required was detailed at length by West Coast. One respect in which this need existed related to West Coast's practice of shopping around among purchasers for preferred items. "We shop from cannery to cannery to get the best merchandise we can so consequently we send the truck in to make the pickup of specific items at a desirable cannery. Having split pickups allows us to buy the items we want when we want them rather than having to compromise and consolidate in a single cannery pickup." This would not be possible if shipment were made by rail. It would appear that having independent control of trucks which might roll from place to place always with the same driver and taking in places not on the standard routes of the common carriers, West Coast could make this selective buy which it could not do if ordered from a single producer with directions to ship by common carrier.

Another specialized need arose from a service which West Coast undertook to perform for groups of independent ad-

vertising chains of grocers. This turned upon the advertising practices of these retailers who advertised specialties from week to week.[1] The Commission makes no finding whatever concerning this aspect of the shipper's specialized needs and its finding last referred to is therefore unsupported by substantial evidence.

Also wholly unsupported is the further finding that protestants have shown that they can provide "the same service proposed by applicant on grocery shipments from the California points of origin to the points of destination in Washington." The applicant showed that the same drivers previously used by West Coast would be employed by them and the desirability of utilizing such drivers to meet the type of emergency mentioned in the last footnote is plain. The necessity of West Coast having absolute control of when and where the truck calls at the supplier's place of business is plain. The evidence shows without contradiction that West Coast requires pickups from towns off the main highways and off the routes of common carriers.[2]

Witnesses for the protestant common carriers testified that they did not even know where some of these towns were. Thus P I E stipulated that it had no general commodity authority in six of these listed towns and no direct general commodity authority to and from Aberdeen. The witness for West Coast was asked to name a typical example of a schedule that involved different points of pickup and the answer was as follows: "A. On the 20th we picked up a lot of 27,775 pounds from Hunts at Tracy and added to that 18,600 pounds from Albers at Sebastopol—that was a noon pick-up and it was unloaded on the 24th which was Friday of that same week. That would be typical." Interestingly enough, some of the protesting carriers had no notion where Sebastopol was located much less were certified to serve it and the witness for Consolidated Freightways said his concern could not serve it.[3]

This sort of thing was shown to be particularly serious. If a carrier has no authority to serve a certain place he cannot effectively furnish the required service by arranging for shipment by another carrier licensed to serve the place. That would involve transshipment and rehandling of the commodity.

1. "We have a unique service, a group of independent advertising chains. These folks really don't know what they are going to advertise from week to week until they see Wednesday night's paper and then they make up their minds what they are going to advertise the following week. The hot items in the ads, any number of the ones we service, four or five of them will ordinarily sell out of what we have on hand and consequently it is very desirable for us to have speed in shipment in getting the merchandise in on orders and also when they have depleted their stock to replenish them so we have something to sell. * * * These trucks are at our disposal and we re-direct them if necessary to bring in merchandise, we don't hesitate to re-direct them. Q. These drivers then, are these drivers driving those trucks on your payroll? A. Yes."

2. Some of such towns listed in the testimony were the following: "Ontario, Chico, Martinez, Granton, Aislton, Santa Clara, Centerville, Thornton, Oroville, San Jose, Hayward, Tracy, Atwater, Antioch, Gridley and Sebastopol."

3. The protesting carriers did not go as far as did the Commission in saying they could furnish "the same service proposed by applicant". Thus the witness for P I E asked about the ability to furnish split pick-ups and split deliveries, qualified by saying "within the confines of its authority". The witness for Los Angeles-Seattle Motor Express stated it "does not serve Aberdeen"; when it had commodities destined for Aberdeen it has to turn them over to other carriers, such as P H T and Coastline. This suggests the necessity of transfer from truck to truck. This carrier witness listed six of the points from which West Coast commonly makes pick-ups which it does not serve and of some the witness had no knowledge whatever. The witness testified that when West Coast began its own private carriage, his concern suffered no diversion of its previous traffic for West Coast. The witness for Consolidated Freightways in like manner listed ten of West Coast's pick-up points which it does not serve, some of them unknown to this concern.

West Coast testified to the disadvantages of this stating that handling certain perishable commodities makes them less saleable.[4]

An attempt to utilize existing common carriers to provide the sort of services anticipated to be furnished by this applicant would present other difficulties which are noted in the record. Thus if the applicant had a permit as sought here West Coast could obtain delivery of any desired goods merely by notifying the contract carrier where to pick up the commodities and where to deliver them. To accomplish the same result with the common carriers with fixed routes and specified authority would present wellnigh insuperable difficulties for West Coast. West Coast representative would have to ascertain which carrier had the appropriate authority covering the point of origin, how far that authority would permit carriage in the dedesired direction, and to what other authorized carrier the commodities would have to be transferred while enroute to Aberdeen, Chehalis or Tacoma. This is an additional factor showing the shipper's need for the contract carriage.[5]

Upon none of these matters do we find any findings by the Commission although the questions here presented are obviously susceptible of findings. The report of the Commission recites as follows: "Thus, we conclude that the record fails to show that the shipper has any need, distinct or otherwise, which can be better met by applicant than by the protestants." In our view, this conclusion is not supported by substantial evidence and it flies in the face of the un-disputed evidence in the case. The evidence is that if the permit were granted, West Coast would have absolute control over the trucks carrying its commodities. It could divert them from the initial course to pick up merchandise needed in an emergency. The truck would be operated by the same drivers previously used under the lease arrangement who would be familiar with West Coast's specialized needs. Split pick-ups and deliveries would be simple; commodities could be picked up from towns unknown to common carriers, or not upon their routes, and brought to destination without rehandling.

■ In dealing with the question of the effect which granting the permit would have upon the services of protesting carriers, the Commission has indulged in some poor speculation. The Commission's report notes that the "shipper asserts that if the application is granted it does not intend to divert to applicant that traffic now handled by existing rail and motor common carriers." Obviously the Commission cannot find anything in the record to contradict that assertion, but it speculates by quoting from a prior report the statement that "a grant of authority *might* well work to the detriment of the protestants' services as it would enable the supporting shipper to divert to the applicant a substantial line of traffic now being handled by them." (Emphasis ours.) The Commission also states "Closer scrutiny of the involved circumstances impels us to recognize the possibility that at some future time there *might* be a substantial diversion of traffic." (Emphasis added.)

---

4. "Q. Why do you prefer single line handling with no transfer of products from one carrier to another carrier enroute?

A. Well canned goods are quite perishable from a damage standpoint and any time we have additional handling usually more damage occurs. Most of it is actually hidden damage—dented cans and such—and once it get on the shelf in the grocery store it doesn't sell. We try to put out undented merchandise if possible and we find each handling in-creased the possibility of that damage. That's one reason and also another reason is the delay in time."

5. A buyer for West Coast testified as follows: "I'm no traffic manager but it requires a lot of specific knowledge to know who can pick up where and make split deliveries on this end and we are primarily in the grocery business and really it is more than we are willing to tackle to try and unravel the pickup points and the delivery points and the authorities."

These speculative findings of a possible substantial diversion of traffic from the common carrier are utterly without justification in view of the statutory provisions with respect to contract carrier permits. In section 309(b) Title 49 U.S.C., immediately following the language of the statute which states the factors to be considered by the Commission, it is provided as follows: "The Commission shall specify in the permit the business of the contract carrier covered thereby and the scope thereof, and it shall attach to it at the time of issuance, and from time to time thereafter, such reasonable terms, conditions, and limitations, consistent with the character of the holder as a contract carrier, including terms, conditions and limitations respecting the person or persons and the number or class thereof for which the contract carrier may perform transportation service, as may be necessary to assure that the business is that of a contract carrier and within the scope of the permit, * * *." Such provisions as are here mentioned are enforceable by the Commission as provided in section 312(a) of Title 49, which provides as follows: "Any such certificate, permit, or license may, upon application of the holder thereof, in the discretion of the Commission, be amended or revoked, in whole or in part, or may upon complaint, or on the Commission's own initiative, after notice and hearing, be suspended, changed, or revoked, in whole or in part, for willful failure to comply with any provision of this chapter, or with any lawful order, rule, or regulation of the Commission promulgated thereunder, or with any term, condition, or limitation of such certificate, permit, or license." The Commission can with the greatest of ease see to it that what it suggests "might" happen, cannot happen.

Referring to the fourth statutory consideration to be taken into account by the Commission, its report concludes that the denial of the application would not adversely affect the supporting shipper "since existing carriers are well able to meet all his transportation requirements." Since the statement just quoted is, as we have indicated, untrue, the Commission's findings in this respect are also without substantial support in the record.

Finally, the Commission fails to consider "the changing character of shipper's requirements" saying that it is not a significant factor here. What we have previously stated indicates that the contrary is true for one of the reasons the shipper requires this contract service is that it furnishes the unique service mentioned for the independent grocers whose needs from week to week may change so as to require the emergency services previously referred to.

■ An examination of the report of the Commission discloses that it is without appropriate findings in that the Commission has contented itself with merely stating the factors which the Commission is required to take into consideration and then asserting that consideration of those factors requires that the questions will be resolved against the applicant. We have here noted the many problems raised by the evidence and that no findings have been made with respect thereto. For instance, there is no finding as to the manner in which commodities might be transported expeditiously and with appropriate speed from such places as Sebastopol, California, to Chehalis or Aberdeen, Washington, through the use of common carriers, and no finding as to how many separate common carriers would have to participate in such a transportation; and what the effect of transferring commodities from one carrier to another enroute would have on the shipper's product.

Accordingly, the report and order of the Commission are vacated and the matter is remanded to the Commission for further consideration in the light of this decision.